## CONTRACT FOR PURCHASE AND SALE OF EQUIPMENT

This **Contract For Purchase And Sale Of Equipment** (the "**Contract**") is made and entered into as of ___9- /8___, 201_2_ (the "**Effective Date**") by and between **Dishon Disposal, Inc.**, a North Dakota corporation (the "**Buyer**"), and **Perfect Circle Water Systems, LLC**, a Delaware limited liability company (the "**Seller**") (each a "**Party**", and collectively the "**Parties**").

**RECITALS**:

A.      Seller desires to sell the equipment defined in Exhibit A to Buyer;

B.      Buyer desires to purchase the equipment defined in Exhibit A from Seller;

C.      Seller and Buyer desire to enter into this Contract to memorialize the relationship between the Parties;

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties mutually agree as follows:

## 1.      Definitions

As used herein, the following terms shall have the following meanings:

**(a)**      "**Affiliate**" means any entity that directly or indirectly Owns, is Owned by or is under common Ownership, with a Party to this Contract, where "Owns" or "Ownership" means direct or indirect possession of at least fifty percent (50%) of the outstanding voting securities of a corporation or a comparable equity interest in any other type of entity; provided, however, that Affiliates shall only include those entities that have expressly accepted this Contract and that have agreed to be bound by all terms and conditions of this Contract.

**(b)**      "**Confidential and Proprietary Information**" means confidential information of a party relating to any designs, know-how, inventions, technical data, ideas, uses, processes, methods, formulae, research and development activities, work in process, or any scientific, engineering, manufacturing, marketing, business plan, financial or personnel matter relating to the disclosing party, its present or future products, sales, suppliers, customers, employees, investors or business, whether in oral, written, graphic or electronic form.

**(c)**      "**Delivery Location**" shall have the meaning ascribed to it in Section 4 (a).

**(d)**      "**Equipment**" shall have the meaning as defined in Exhibit A.

1


EXHIBIT
B

(e) **"Exclusive Service Period"** shall have the meaning ascribed to it in Section 2(a)(i).

(f) **"Force Majeure"** means storms, floods, earthquakes, acts of God, acts of civil or military authority, quarantine restrictions, riots, fires, lock-outs, commercial impossibility, explosions and bombings, acts of war and terrorism or any other cause or causes beyond the reasonable control of the party seeking to be excused from performance.

(g) **"GAAP"** shall mean U.S. generally accepted accounting principles.

(h) **"Intellectual Property Rights"** means any now known or hereafter existing (a) rights associated with works of authorship throughout the universe, including exclusive exploitation rights, copyrights, moral rights and mask works, (b) trademark and trade name rights and similar rights, (c) trade secret rights, (d) patents, designs, algorithms and other industrial property rights, (e) other intellectual and industrial property and proprietary rights of every kind and nature throughout the universe, whether arising by operation of law, by contract or license, or otherwise, and (f) all registrations, applications, renewals, extensions, combinations, divisions or reissues of the foregoing.

(i) **"Maintenance and Operation Services"** means those maintenance and operation services specified on **Exhibit B** hereto.

(j) **"Purchase Price"** shall have the meaning ascribed to it in Section 3.

(k) **"Term"** shall have the meaning ascribed to it in Section 6.

2. **Equipment purchased and documentation provided**

(a) **Exclusive Service.**

(i) For the period beginning with the Effective Date and continue for a period of five (5) years from the Commencement Date, unless earlier terminated pursuant to the terms and conditions of this Agreement; provided, however, that commencing on the fifth (5th) anniversary of the Commencement Date, the Term shall automatically extend for an additional five (5) years according to the High Solid Waste and Water Treatment Facility Services Agreement, by and between Dishon Diposal, Inc. and Perfect Circle Water Systems, LLC, dated July 1, 2012 (the "Services Agreement"). Buyer shall exclusively contract with Seller for the maintenance, operation and repair of the Equipment during the Term of this Contract (the above collectively the "Exclusive Service Period").

(ii) During the Exclusive Service Period, Buyer shall only purchase Maintenance and Operation Services for the Equipment, including spare parts, from Seller, unless Seller either (A) approves in writing a specific purchase of

2

specific maintenance and operation services by Buyer from a third party, or (B) provides written notice to Buyer that it is unable to supply Maintenance and Operation Services to Buyer, in which case Buyer shall be free to purchase such specific Maintenance and Operation Services only, subject of Seller's written notice under this clause (B), from a third party. Any notice from Seller under Clause (B) hereof shall not affect the continuing obligation of Buyer to purchase all of Buyer's and its Affiliates' requirements for Maintenance and Operation Services for the remainder of the Exclusive Service Period other than the Maintenance and Operation Services covered by such notice.

(b)     **Exclusive Situs.** The Equipment shall remain exclusively at the Delivery Location during the Term of the Contract. Any removal of the Equipment by Buyer shall be deemed a material breach of this Contract. Buyer acknowledges that the damages resulting from the breach of this Subparagraph (b) would be impossible to calculate. Therefore, Buyer hereby agrees that the Seller shall be entitled to injunctive relief preventing the removal of the Equipment in violation of the terms hereof. Such injunctive relief shall be in addition to any other remedies available hereunder, whether at law or in equity. Seller shall be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief.

## 3.     Purchase Price

This purchase price to be paid by Buyer to Seller for the Equipment (the **"Purchase Price"**) shall be a fixed price specified below payable as follows:

(a)     **Equipment.** The Purchase Price for the Equipment and all spare part shall be equal to Eight Million, One Hundred Thousand Dollars (\$8,100,000.00).

(b)     **Taxes.** Buyer will pay all non-U.S. export charges, import duties, any and all sales, use, excise, value added or other taxes or assessments imposed by any governmental authority upon or applicable to any sale to Buyer of the Equipment under this Contract, and all costs and charges for transportation, handling and insurance of the Equipment from the point of shipment.

(c)     **Payment of Purchase Price.** The Purchase Price for the Equipment supplied under this Contract shall be payable in accordance with the terms of the invoice. Buyer shall pay the full amount of the invoice, in US dollars.

## 4.     Delivery of the Equipment

(a)     **Delivery Location.** The location of the delivery for the Equipment shall be 4386 153rd Avenue NW, Williston, ND 58801 (the **"Delivery Location"**).

## 5.     Installation and Acceptance of the Equipment

(a) Buyer acknowledges and stipulates that the Equipment:

   (i)    has been delivered and installed;

   (ii)   has been inspected and accepted by Buyer for all purposes; and

   (iii)  is in good condition.

(b) **Acceptance.** In consideration of Section 5(a) hereinabove, Buyer stipulates that it has accepted the Equipment in the condition as delivered.

## 6.    Term

The term of this Contract (the **"Term"**) shall commence on the Effective Date and continue for a period of five (5) years from the Commencement Date, unless earlier terminated pursuant to the terms and conditions of this Agreement; provided, however, that commencing on the fifth (5th) anniversary of the Commencement Date, the Term shall automatically extend for an additional five (5) years. Seller may terminate this Contract at the expiration of the Term or any renewal term (the "Termination") by submitting to Buyer a Notice of Election in the form of **Exhibit C.**

## 7.    Title and Risk of Loss

**Title to, and the risk of loss, injury or destruction of the Equipment, from any cause whatsoever shall pass to Buyer upon the delivery of the Equipment to the Delivery Location.**

## 8.    Warranties And Remedies

(a) **Installation Services Warranty.** Seller warrants that the installation services will be performed only by personnel who are trained and qualified to perform such services and that all services shall be performed professionally.

(b) **AS IS.** THE SELLER IS SELLING THE EQUIPMENT IN "AS IN" CONDITION. THE SELLER HAS DISCLOSED ALL KNOWN DEFECTS WITH THE EQUIPMENT. THE BUYER HAS THE RIGHT TO MAKE ANY AND ALL INSPECTIONS, BUT THE SELLER WILL NOT PAY FOR ANY REPAIRS, CORRECTIONS OR REPLACEMENTS.

(c) THE ABOVE WARRANTY IS IN LIEU OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES, EXPRESS OR IMPLIED, AND SELLER SPECIFICALLY DISCLAIMS ALL SUCH OTHER EXPRESS OR IMPLIED WARRANTIES AND/OR AGREEMENTS INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. EXCEPT FOR DAMAGES ARISING FROM DEATH OR BODILY INJURY TO THE EXTENT CAUSED DIRECTLY BY THE ACTS OR OMISSIONS

OF SELLER, SELLER SHALL NOT BE LIABLE TO BUYER OR ITS AFFILIATES FOR ANY DAMAGES IN CONNECTION WITH THE SALE OF SYSTEMS OR THE PERFORMANCE OF SERVICES UNDER THIS CONTRACT, WHETHER ARISING IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY ONE STATEMENT WORK IN EXCESS OF THE PURCHASE PRICE FOR THE SYSTEMS AND SERVICES PROVIDED AND PAID TO SELLER BY BUYER AND RETAINED BY SELLER UNDER THE SPECIFIC STATEMENT OF WORK GIVING RISE TO BUYER'S CLAIM.

**(d)** TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, SELLER'S ENTIRE LIABILITY TO BUYER FOR SERVICES REGARDLESS OF THE FORM OF ACTION SHALL IN NO EVENT EXCEED TOTAL PURCHASE PRICE PAID TO SELLER BY BUYER AND RETAINED BY SELLER FOR THE SPECIFIC SERVICE GIVING RISE TO BUYER'S CLAIM.

**(e)** NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, SELLER SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, WHETHER FORESEEABLE OR NOT, THAT ARE IN ANY WAY RELATED TO THIS CONTRACT, THE BREACH THEREOF, THE USE OR INABILITY TO USE THE SYSTEMS, THE RESULTS GENERATED FROM THE USE OF THE SYSTEMS, THE QUALITY OF THE SYSTEMS, ANY DEFECT IN THE SYSTEMS, FAILURE OF THE SYSTEMS TO PERFORM AS REPRESENTED OR EXPECTED, THE SERVICES, THE USE OR INABILITY TO USE RESULTS OF THE SERVICES, ANY TRANSACTIONS RESULTING FROM THIS CONTRACT, LOSS OF GOODWILL OR PROFITS, LOST BUSINESS HOWEVER CHARACTERIZED AND/OR FROM ANY OTHER CAUSE WHATSOEVER.

**(f)** THE PARTIES FURTHER AGREE THAT EACH AND EVERY PROVISION OF THIS CONTRACT THAT PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES IS EXPRESSLY INTENDED TO BE SEVERABLE AND INDEPENDENT OF ANY OTHER PROVISION SINCE THOSE PROVISIONS REPRESENT SEPARATE ELEMENTS OF RISK ALLOCATION BETWEEN THE PARTIES AND SHALL BE SEPARATELY ENFORCED.

9. **Termination**

(a) **Insolvency.** Either Party shall be entitled to terminate this Contaract, and the Parties' duties and obligations hereunder and thereunder, on thirty (30) days prior written notice to the other party in the event the other party becomes insolvent or seeks protection, voluntarily or involuntarily, under applicable bankruptcy laws.

(b) **Payment Default.** This Contract, and the Parties' duties and obligations hereunder, may be terminated by Seller upon Buyer's failure to make payment under any undisputed portion of any invoice on the due date for such invoice and Buyer's failure to

5

cure such delinquency within ten (10) days following receipt of written notice thereof from Seller to Buyer. Seller may not withhold performance or term this Contract if Buyer disputes any invoice or portion of any invoice in good faith and fails to pay such invoice while the dispute is pending.

(c) **Termination for Cause.** Either party may terminate this Contract at any time during Term, upon forty-five (45) days prior written notice to the other party, if the other party materially breaches any term or condition of this Contract (other than a payment default under Section 9(b)) and fails to cure such breach within the forty-five (45) day cure period. As used in this Contract, a "material breach" shall mean a material misstatement or omission in any representation or warranty of a party.

(d) **Effect of Termination.** In the event of termination, both Parties shall be liable for all obligations that accrued prior to termination, and for all obligations that survives the termination or expiration of this Contract.

## 10. Compliance With Laws

(a) **Compliance/Manufacturing Standards.** Seller and Buyer each shall be responsible for complying with all applicable legal and regulatory requirements of the United States and any other national, state or local regulatory agency, department, bureau, commission, council or other governmental entity regarding the manufacture and supply of the Equipment under this Contract.

## 11. Confidentiality

(a) **Confidential Information:** For the purposes of this Agreement, "Confidential Information" means any data or information that is proprietary to Seller, or any of its Affiliates, subsidiaries, clients and affiliated companies, not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including but not limited to: (i) any marketing strategies, plans, financial information or projections, operations, sales estimates, business plans and performance results relating to past, present or future business activities of Seller, its affiliates, subsidiaries, clients and affiliated companies; (ii) plans for products or services, and customer or supplier lists; (iii) any scientific or technical information, invention design, process, procedure, formula, method, improvement, or technology; (iv) any concepts, reports, data, know-how, works in progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (v) any other information that should reasonably be recognized as confidential information of Seller. Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be designated Confidential Information. Buyer acknowledges that the Confidential Information is proprietary to Seller, has been developed and obtained through great efforts by Seller and that Seller regards all of its Confidential Information as trade secrets.

6

**(b)** **Restriction and Purpose of Confidential Information:** From time to time, Seller may disclose Confidential Information to Buyer. Buyer shall: (a) limit disclosure of Confidential Information to its directors, officers, employees, agents or representatives (collectively "Representatives") who have a need to know such Confidential Information in connection with the current or contemplated business relationship between the Parties to which this Agreement relates, and only for that purpose; (b) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth in this Agreement and require such Representatives to keep the Confidential Information confidential; (c) keep all Confidential Information strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information; and (d) not disclose any Confidential Information received by it to any third parties (except as otherwise provided for herein).

Buyer shall be responsible for any breach of this Agreement by any of its respective Representatives.

**(c)** **Use of Confidential Information:** Buyer shall use the Confidential Information solely in connection with the current or contemplated business relationship between the Parties and for not for any purpose other than as authorized by this Agreement without the prior written consent of an authorized representative of Seller. No other right or license, whether expressed or implied, in the Confidential Information is granted to Buyer hereunder. Title to the Confidential Information will remain solely in Seller. All use of Confidential Information by Buyer shall be for the benefit of Seller and any modifications and improvements thereof by Buyer shall be the sole property of Seller.

**(d)** **Non-Circumvention:** Buyer, from time to time, may learn from Seller, or from principals, the names and telephone numbers of investors, borrowers, lenders, agents, brokers, banks, lending corporations, individuals and/or trusts, or buyers and sellers hereinafter "Contacts". Buyer stipulates and agrees these Contacts are Confidential Information. Buyer with this acknowledges, accepts and agrees that the identities of such Contacts will be recognized by Seller as exclusive and valuable contacts of Seller and will remain so for the duration of this Agreement. Buyer shall not at any time prior to the expiration of this Agreement, without prior written consent of Seller, (a) attempt in any manner to deal directly or indirectly in any manner with any of the Contacts or other individuals or companies related to any business opportunity including by having part of or deriving any benefit from the business opportunity or any aspect thereof, or (b) bypass, compete, avoid, circumvent or attempt to circumvent Seller relative to any business opportunity including by utilizing any of the Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information.

**(e)** **Confidentiality Period:** Buyer's duty to protect Confidential Information and to restrict its use to the purpose stated in **Section 11 (b) - (c)** shall last until either Seller releases Buyer from its duty of confidentiality or Seller has released the Confidential Information into the public domain. The obligation to protect the Confidential Information and the restriction on use of the Confidential Information shall survive expiration or termination of this Agreement for the duration of the Confidentiality Period.

(f)     **Standard of Care**: Buyer shall protect the disclosed Confidential Information by using the same degree of care as Buyer uses to protect its own Confidential Information of a like nature, but no less than a reasonable degree of care, to prevent the unauthorized use, disclosure, dissemination, or publication of the Confidential Information.

(g)     **Exclusions**: This Agreement imposes no obligation upon Buyer with respect to Confidential Information that:

   i.   Was rightfully in Buyer's possession, without obligation to protect, before receipt from Seller;

   ii.  Is or becomes a matter of public knowledge through no fault of Buyer;

   iii. Is rightfully received by Buyer from a third party without a duty of confidentiality;

   iv.  Is disclosed by Seller to a third party without a duty of confidentiality on the third party;

   v.   Is independently developed by Buyer; or

   vi.  Must be disclosed under operation of law or regulation.

If Buyer is confronted with any situation covered under **Section 11 (g)(vi)** above, Buyer shall promptly notify in writing and reasonably assist Seller in obtaining a protective order.

(h)     **Warranty**: Seller warrants only that it has the right to make the disclosures of Confidential Information under this Agreement. **No other warranties, express or implied, including warranties of merchantability, fitness, and title or against infringement are made by Seller under this Agreement. Any confidential information disclosed under this Agreement is provided "AS IS."**

(i)**Return of Property**: Buyer shall immediately return and redeliver to Seller all tangible material embodying the Confidential Information provided hereunder and all notes, summaries, memoranda, drawings, manuals, records, excerpts or derivative information deriving there from and all other documents or materials ("Notes") (and all copies of any of the foregoing, including "copies" that have been converted to computerized media in the from of image, data or word processing files wither manually or by image capture) based on or including any Confidential Information, in whatever form of storage or retrieval, upon the earlier of (i) the completion or termination of the dealings between the parties contemplated hereunder; (ii) the termination of this Agreement; or (iii) at such time as Seller may so request; provided however that Buyer may retain such of its documents as is necessary to enable it to comply with its document retention policies. Alternatively, Buyer, with the written consent of Seller may (or in the

8

case of Notes, at the Receiving Party's option) immediately destroy any of the foregoing embodying Confidential Information (or reasonably nonrecoverable data erasure of computerized data) and, upon request, certify in writing such destruction by an authorized officer of the of Buyer supervising the destruction.

**(j) Rights:** Buyer does not acquire any intellectual property rights under this Agreement except limited rights necessary to carry out the purpose set forth Buyer's employees to other tasks or projects, provided that such reassigned employees are not relieved of their obligations under this Agreement.

**(k) Remedies:** Buyer acknowledges that the Confidential Information to be disclosed hereunder is of a unique and valuable character, and that the unauthorized dissemination of the Confidential Information would destroy or diminish the value of such information. The damages to Seller that would result from the unauthorized dissemination of the Confidential Information would be impossible to calculate. Therefore, Buyer hereby agrees that Seller shall be entitled to injunctive relief preventing the dissemination of any Confidential Information in violation of the terms hereof. Such injunctive relief shall be in addition to any other remedies available hereunder, whether at law or in equity. Seller shall be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

**(l) Notice of Breach:** Buyer shall notify Seller immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Buyer or its Representatives, and will cooperate with efforts by Seller to help Seller regain possession of Confidential Information and prevent its further unauthorized use.

**(m) Expenses:** Each Party is responsible for its own expenses incurred as a result of any discussion between the Parties.

## 12. Ownership

Buyer stipulates that the ownership rights of Seller with respect to the patents, patent applications, copyrights, trade secrets and other Intellectual Property Rights to the Equipment are fully vested in the Seller. All modifications, enhancements, improvements to and derivative works of the Equipment or any components thereof or any other proprietary information, data, methods, methodologies, templates, software (including source code and object code), algorithms, libraries, design flows, processes, databases, tools, processes, interfaces, documentation, mask works, encoding techniques, electronic components and other trade secrets and other Intellectual Property Rights, that are developed, conceived or made by any employee or contractor to Seller or Buyer in the course of performing its obligations under this Contract or the Services Agreement(collectively, the **"Works"**) shall be the exclusive and sole property of Seller, and Seller shall be deemed the exclusive author and owner of all Works and all Intellectual Property Rights therein. All worldwide rights, title and interest in any and all trade secrets and know-how discovered or developed by any employee or Buyer of Seller in the course

9

of performing its obligations under this Contract or the Services Agreement, shall be held and owned exclusively by Seller (the **"Trade Secrets"**), and Buyer hereby irrevocably assigns and transfers the Trade Secrets to Seller.

## 13. Remedies

The remedies of the Parties contained in this Contract are cumulative with one another and with any other remedies which the parties may have at law, in equity, under any Contracts of any type or otherwise, and the exercise or failure to exercise any remedy shall not preclude the exercise of that remedy at another time or of any other remedy at any time. No waiver of a breach of any provision of this Contract shall constitute a waiver of any other breach or of such provision. The invalidity in whole or in part of any condition of this Contract shall not affect the validity of other conditions.

## 14. Insurance

Buyer shall obtain and maintain for the Term (and any renewal term or extension), at its own expense, (a) "all risk" insurance against loss or damage to the Equipment, (b) commercial general liability insurance (including contractual liability, products liability and completed operations coverage) reasonably satisfactory to Seller, and (c) such other insurance against such other risks of loss and with such terms, as shall in each case be reasonably satisfactory to or reasonably required by Seller (as to carriers, amounts and otherwise). The amount of the "all risk" insurance shall be greater than or equal to the value of the Equipment, and must otherwise be reasonably satisfactory to Seller as of each anniversary date of this Lease. Any increase in the amount of such insurance coverage, other than "all risk", reasonably requested by Seller and in amounts which are customary in Buyer's industry shall be put into effect on the next succeeding renewal date of such insurance.

Each "all risk" policy shall: (i) name Seller as sole loss payee with respect to the Equipment until full payment is made for said Equipment, (ii) provide for each insurer's waiver of its right of subrogation against Seller and Buyer, and (iii) provide that such insurance shall not be invalidated by any action of, or breach of warranty by, Buyer of a provision of any of its insurance policies, and shall waive set-off, counterclaim or offset against Seller.

Each liability policy shall name Seller as an additional insured until the Purchase price is fully satisfied, and provide that such insurance shall have cross-liability and severability of interest endorsements (which shall not increase the aggregate policy limits of Buyer's insurance).

All insurance policies shall provide that Buyer's insurance shall be primary without a right of contribution of Seller's insurance, if any, or any obligation on the part of Seller to pay premiums of Buyer, and shall contain a clause requiring the insurer to give Seller at least thirty (30) days' prior written notice of its cancellation (other than cancellation for non-payment for which ten (10) days' notice shall be sufficient). Buyer shall, on or prior to the Effective Date and prior to each policy renewal, furnish to Seller certificates of insurance or other evidence satisfactory to Seller that such insurance coverage is in effect. Buyer further agrees to give Seller prompt notice of any damage to, or loss of, the Equipment, or any part thereof.

10

## 15. Assignment And Delegation

Neither this Contract nor any right, obligation or duty hereunder of either party, may be assigned to, or assumed or performed by, any third party, without the prior written consent of the non-assigning party; provided, however, that a change in the equity ownership of Seller or Buyer shall be deemed not an assignment. Any purported assignment or delegation made without compliance with the requirements of this Section 15 shall be wholly void and ineffective for all purposes.

## 16. Integration

This Contract, together with the Services Agreement and all exhibits hereunder (each of which is incorporated herein by reference), sets forth the entire agreement and understanding of the parties with respect to transactions contemplated hereby and thereby and supersedes any and all prior contracts, agreements and understandings of the parties relating to the subject matter hereof and thereof.

## 17. Amendment/Waiver

This Contract may be amended, modified, superseded or canceled, and any of the terms, representations, warranties, covenants and conditions herein may be waived, only by an instrument in writing executed by both Parties or, in the case of a waiver, by the Party waiving compliance.

## 18. Force Majeure

(a)     "Force Majeure Event" means an event, condition or circumstance beyond the reasonable control of, and not due to the fault or negligence of, the Party affected, and which could not have been avoided by due diligence and use of reasonable efforts, which prevents the performance by such affected party of its obligations hereunder; provided, that such a "Force Majeure Event" shall not be deemed to have occurred or to be continuing unless the Party claiming Force Majeure complies with the requirements of **Section 18 (b)**. Subject to the foregoing, "Force Majeure Event" shall include, as to either Party, explosion and fire (in either case to the extent nor attributable to the negligence of the affected Party), flood, earthquake, storm or other natural calamity or act of God, strike or other labor dispute, war, insurrection or riot, actions or failures to act by governmental entities or officials, failure to obtain governmental permits or approvals (despite timely application thereof and due diligence) and changes in the laws, rules, regulations, orders or ordinances affecting operation of the Equipment, which events were not pending on the date of this Agreement.

(b)     If either Party is rendered wholly or partially unable to perform its obligations under this Agreement (other than payment obligations) due to a Force Majeure Event, the Party affected by such Force Majeure Event shall be excused from the impaired

11

performance caused by such Force Majeure Event, provided that the affected Party, upon learning of such Force Majeure Event and ascertaining that it will affect performance hereunder, (i) give notice to the other Party, as soon as practicable, stating the nature of the Force Majeure Event, its anticipated duration, and any action being taken to avoid or minimize its effect and (ii) uses its commercially reasonable efforts to remedy its inability to perform. The suspension of performance shall be of no greater scope and no longer duration than that which is necessary. No obligation of either Party which arose before the occurrence causing the suspension of performance and which could and should have been fully performed before such occurrence shall be excused as a result of such occurrence. The burden of proof shall be on the Party asserting excuse from performance due to a Force Majeure Event.

## 19. Advertising

Neither Buyer nor Seller shall at any time use the other party or its Affiliates' names, trademarks or trade names in any advertising or publicity without the prior written consent of such party.

## 20. Notices

The Parties shall send any and all notices, requests, consents, approvals, waivers or other communication required or allowed under this Agreement in writing and such notices or other communications will be deemed properly given, effective and received: (i) if delivered by hand, at the time of delivery to the receiving Party, regardless of whether the receiving Party signs an acknowledgment of receipt; (ii) if mailed to the addresses below by certified mail return receipt requested, the later of the third (3rd) business day following the date of mailing, or the date indicated on the signed receipt; or (iii) if delivered by overnight courier to the addresses listed below, the later of the time the receiving Party signs for such delivery, or sending Party receives confirmation of delivery from the courier service.

| If to Seller: | Perfect Circle Water Systems, LLC<br>12603 Southwest Freeway, Suite 170<br>Stafford, Texas 77477 |
|---|---|
| | Attention: Terry Dunken |
| If to the Buyer: | Dishon Disposal, Inc.<br>15242 39th Lane NW<br>Williston, North Dakota 58801 |
| | Attention: Terry Dishon |

or to such other person or address as either party shall have specified by notice in writing to the other party hereto.

## 21. Governing Law

The laws of the State of Texas govern all matters arising out of or relating to this Agreement, including the validity, interpretation, construction, performance and enforcement, without giving effect to the conflict of laws provisions thereof.

## 22. Severability

The invalidity or unenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision contained herein.

## 23. No Solicitation

During the Term of this Contract and for a period of one (1) year after termination of this Contract, neither Buyer nor Seller shall not induce, solicit, assist, or have discussions or any other communications with any employee of the other Party or its Affiliates to influence or cause that employee to terminate employment with such Party, and will not facilitate, inducement, solicitation, discussion or any other communication by a third person of or with any employee of the other Party to influence or cause that employee to terminate employment with the other Party.

## 24. Headings

The headings used in this Contract are for convenience of reference only, shall not be deemed to be a part of this Contract and shall not be referred to in connection with the construction or interpretation of this Contract.

## 25. Construction

In the interpretation and construction of this Contract, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Contract shall not be deemed, for the purpose of construction and interpretation, to have been drafted by either Party.

## 26. Counterparts

This Contract may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page to this Contract by email or facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Contract.

## 27. Survival

The provisions of Sections 7, 8, 9(d), 11, 12, 13, 14, 15, 21, 22, 23, 27 and 28 shall survive termination of this Contract.

## 28. Dispute Resolution

(a) **Multi-Step.**

    *i. Dispute.* "Dispute" means any dispute, controversy or claim (of any kind or type, whether based on contract, tort, statute, regulation or otherwise) arising between the Parties or out of, related to, or connected with this Agreement, or the operations carried out under this Agreement, including but not limited to any dispute concerning the existence, validity, interpretation, performance, breach or termination of this Agreement.

    *ii. Notification.* A Party who desires to submit a Dispute for resolution shall commence the dispute resolution process by providing the other Parties to the Dispute a written notice of the Dispute ("Notice of Dispute"). The Notice of Dispute will identify the Parties of the Dispute and contain a brief statement of the nature of the Dispute and the relief requested. The submission of a Notice of Dispute shall toll any statute of limitations or prescriptive periods related to the Dispute, pending the conclusion or abandonment of dispute resolution proceedings under this Agreement.

    *iii. Negotiations.* The Parties to the Dispute shall first seek to resolve any Dispute by negotiation. Within fifteen (15) days after the date of the receipt by each Party to the Dispute of the Notice of Dispute, the Parties to the Dispute shall meet at a mutually acceptable time and place to exchange relevant information in an attempt to resolve the Dispute. Parties may seek representation by an attorney, and such attorney may accompany the Parties to said meeting. If a Party intends to be accompanied at the meeting by an attorney, the represented Party shall give each other Party written notice of such intention at least five (5) business days in advance.

    *iv. Mediation.* Subject to the requirement of negotiation between Parties pursuant to **Article 28 (a)(iii),** the Parties to the Dispute shall seek to resolve the Dispute by mediation. Within thirty (30) days after the date of the receipt of Notice of Dispute by each Party, any Party to the Dispute may initiate mediation proceedings pursuant to the Commercial Mediation Rules and Procedures of the American Arbitration Association ("AAA"), as modified herein, by sending all other Parties to the Dispute a written request that the Dispute be mediated.

    *v. Transition to Arbitration.* In the event the Dispute is not resolved within sixty (60) days of receipt by each Party to the Dispute of the Notice of Dispute, the Parties shall submit to final and binding arbitration to resolve the Dispute.

(b) **Arbitration.**

    *i.* Subject to the requirements of negotiation and mediation, any Dispute arising out of or relating to this Agreement will be finally settled by

binding arbitration in accordance with the Rules of Arbitration of AAA, as modified herein.

*ii. Number of Arbitrators.* Three (3) arbitrators will conduct the arbitration, unless all Parties to the Dispute agree to the use of a sole arbitrator within thirty (30) days after commencement of the arbitration.

*iii. Method of Appointing the Arbitrators.* If the arbitration is to be conducted by three (3) arbitrators, all claimants shall jointly appoint one (1) arbitrator and all respondents shall jointly appoint one (1) arbitrator. These two arbitrators so appointed will select the presiding arbitrator within thirty (30) days after their appointment. If the Party-appointed arbitrators fail to appoint the presiding arbitrator in a timely fashion, then the Parties shall make a joint appointment of the presiding arbitrator. If Parties fail to make a joint appointment of an arbitrator, AAA will appoint the presiding arbitrator.

*iv. Qualifications and Conduct of the Arbitrators.* All arbitrators will be and remain at all times independent and impartial, and, once appointed, no Party to the Dispute shall have any ex parte communications with any of the arbitrators, other than communications directly concerning the selection of the presiding arbitrator. The Parties shall select arbitrators that are qualified by education, training, or experience to resolve the Dispute.

*v. Costs and Attorneys' Fees.* The arbitral tribunal is authorized to award costs, attorneys' fees and expert witness fees, and to allocate these fees among the Parties.

*vi. Interest.* The award may include interest, as determined by the arbitral tribunal, from the date of any default, breach, or other accrual of a claim until the arbitral award is paid in full.

*vii. Currency of the Award.* The arbitral award will be made payable in United States Dollars, free of any tax or other deduction.

*viii. Consolidation.* If there exists multiple arbitrations (more than one) between or among the same Parties, the subject matters of which are related by common questions of law or fact, and which could result in conflicting or inconsistent awards, that all such arbitrations may be consolidated into a single arbitration.

**(c)    Confidentiality.** All negotiations, mediation, and arbitration relating to a Dispute (including a settlement resulting from negotiation or mediation, an arbitral award, documents exchanged or produced during a mediation or arbitration proceeding, and memorials, briefs or other documents prepared for arbitration or mediation) are

confidential and may not be disclosed by the Parties, their employees, officers, directors, counsel, consultants and expert witnesses, except to the extent necessary to enforce any settlement agreement, arbitral award, or expert determination, to enforce other rights of a Party, as required by law or regulation, or for a bona fide business purpose, such as disclosure to accountants, shareholders, or third-party purchasers; provided, however, that breach of this confidentiality provision will not void any settlement, expert determination, or award.

**(d)** **Notice.** Any papers, notices, or process necessary or proper for a negotiation, mediation or arbitration hereunder or any court action in connection with a settlement agreement, arbitration or arbitral award may be served on a Party by registered or certified mail or courier, provided that a reasonable opportunity to be heard with regard to the court action is or has been granted to the Party.

## 29. Authority

The Parties executing this Contract on behalf of Buyer and Seller represent and warrant that they have the corporate and other authority to enter into this Contract and to bind their respective companies to all the terms and conditions of this Contract.

## 30. Further Assurances

Both Parties agree to execute such additional documents and perform such acts as are reasonably necessary to effectuate the intent of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the Effective Date.

INITIALS _TD_ (Buyer)

**BUYER:**

**DISHON DISPOSAL, INC.**

By: _____

Name: Terry Dishon

Title: President

INITIALS _TD_ (Seller)

**SELLER:**

**PERFECT CIRCLE WATER SYSTEMS, LLC.**

By: _____

Name: Terry Dunken

Title: Manager

16

**Description of the Equipment: High Solids Unit with Chloride Concentration**

- **Treatment Unit** – x3 40' Modular Treatment units with chassis, insulated and finished out with electrical, lighting, ventilation and heating; Flocculation and Solids Separation Unit
- **Throughput** – 1 bbl/min treatment capacity
- **Flocculation** – micro flocculation capability

**Flocculation and Solids Separation Unit**

- o x2 Hopper Auger assemblies
- o 1000 gallon four stage continuous flow mix chambers
- o 160 gpm Drum Filter
- o Vacuum Table complete with interconnecting piping, receiver, and pump
- o PLC controls with all flow components

**Flocculation Support Unit**

- o x2 100 gpm Centrifugal Solids Separators
- o x2 300 gallon Pre-treatment Ozone Clarifiers complete with Oxygen Concentration,
  - ▪ Ozone Generation and Venturi Injection
- o x3 150 gallon Polymer Hydrators
- o x2 300 gallon Post-Floc Ozone Clarifiers complete with Oxygen Concentration, Ozone
  - ▪ Generation and Venturi Injection
- o x6 Media Filtration Pods
- o PLC controls with all flow components

# EQUIPMENT TREATMENT DESCRIPTION HIGH SOLIDS UNIT WITH CHLORIDE CONCENTRATION PROCESS FLOW

The High Solids Unit with Chloride Concentration is designed with two treatment phases with one additional treatment option to handle a combined light or heavy solids waste and water treatment to reuse or down hole injections qualities.

1) The initial pre-treatment phase utilizes centrifugal separation, coagulation, polymer adjusted bentonite clay flocculation, mechanical flocculent separation, and mechanical filtration for the initial pre-treatment step to prepare the water for the pre-treatment polishing phase.

   o Coagulation targets contaminants prior and in aide of the flocculation process of all volume of water to be treated. Upon entry to the unit, water enters centrifugal separation for particulate removal of larger suspended solids. This is sized by the manufacturer to the flow rate and particulate removal target.

   o The flow rate throughout the unit is 126gpm up to the membrane separation and is set to adjust through the two phases to equal a 126gpm final output. The solids from the centrifugal separation are purged on demand to bag filtration for periodic removal from the unit.

   o After centrifugal separation; the water enters the two coagulation clarifies on a continuous circulation. This is a synergistic beginning to the total treatment process. The initial target is the coagulation of organic molecules and bacteria anticipated from down hole and storage growth in an oil field setting.

   o Water leaves the pre-treatment clarifiers and enters the continuous flow flocculation unit for flocculation using raw bentonite clay, high concentrated liquid polymers, and any pH adjustment if necessary. The bentonite clay or a special blend of bentonite clay with powder polymers, blend chemicals, pH adjusters, or flocculent enhancers can be added through three auger assemblies which load into the first mix chamber.

   o The first, second, and third mix chambers all have the capability of mixing in a bentonite clay, cationic polymer, anionic polymer, or any additive hydrated to a specific concentration in one of three hydrators. These hydrators have auger assemblies which feed a multi chamber, multi mixer continuous flow unit much like the continuous flow flocculation unit. It mixes on demand with recycled water to a pre-set concentration and mole strength determined. Four mix chambers are sized accordingly to achieve the necessary blending, mixing, and dwelling for the 126gpm flow up to guaranteed loading of the waste water at 5 minutes per mix chamber.

   o The continuous flow flocculation design, as opposed to batch treatment, is a very efficient and calculating use of colloidal technology.

- With ozone used as the pre-treatment, it neutralizes the treatment capability of incoming water to a very small range, giving consistency to the treatment. Each chamber can be mixed to different speed and shaft rotation as well as the use of removable weirs between chambers for targeted blending.
- After leaving the final chamber, the coagulated flocculent and pre-treated water enter the drum filter for separation of the flocculent in the drum and removal out the end for further dewatering. The screen size and rotation of the drum are specific to the solid loading and clay used in the treatment process.
- A dewatering collection bin is located outside the 1st unit for collection and vacuum dewatering of the solid flocculent separated in the drum filter. Residual water pulled from the bin is taken back to the head of the treatment unit in the first mix chamber. The pre-treated water is collected in the bottom of the drum filter for automatic transfer.

2) The pre-treatment polishing phase is to insure any and all residual has been removed from the flocculated water leaving the drum filter. This phase utilizes stabilization and mechanical filtration to polish the water for final treatment quality. It is made up of two additional stabilization clarifiers, dwell clarifier, and twelve media pods.

- The water is pumped from the base collection of the drum filter to the two post flocculation stabilization clarifiers. The predominant reason for this stabilization process is to agglomerate and coagulate any residual polymer and clay particles which have made it to this point of the pre-treatment.
- Once bound to a larger size, they can easily be filtered.
- From these clarifiers, there are two types of mechanical filtration to insure they are removed prior to the discharge from the unit. The first is a recirculation from each clarifier through a dwell clarifier which will filter down to 50 microns.
- The solids from the dwell clarifier settle and are purged on demand to bag filtration for periodic removal from the unit. This is a continuous circulation, as with the clarifiers, and the largest amount of residual solids will be removed at this point.
- Water from these clarifiers now is pressured through the media pods for filtration down to 5 microns in selected media. These pods go into automatic back flush on timer or loading pressure demand and can be run in series or parallel.
- The solids from the media pods are purged on demand to bag filtration for periodic removal from the unit.
- Water leaving the media pods is pumped off the unit.

3) The optional treatment designed into this unit is for when heavy solids are not experienced and the complete need of flocculation for heavy solids removal is limited. Water can bypass the flocculation phase in an optional flow through coil mechanical filtration to remove the initial solids loading prior to the pre-treatment polishing phase.

## SCOPE OF SERVICES

A. Providing such trained personnel as is reasonably necessary to operate and maintain the Equipment and provide the services set forth in this Agreement.

B. Operating and maintaining the Equipment in accordance with this Agreement, including, but not limited to, this **EXHIBIT B**.

C. Planning and managing on-site operations and maintenance activities, including:

   1. Assuring that the Equipment is operated in accordance with this Agreement and in a safe, reliable, efficient, and prudent manner.
   2. Assuring that operations and maintenance personnel are trained and qualified for their assigned responsibilities and tasks, and that such qualification is maintained.
   3. Assuring that the Equipment meets contract, regulatory, and environmental requirements set forth in this Agreement.
   4. Managing and controlling costs consistent with budget requirements.
   5. Planning, scheduling and managing work and maintenance activities.
   6. Defining and documenting operational technical requirements.
   7. Defining and delineating responsibilities between Seller and Buyer and identifying reporting requirements.
   8. Establishing labor relations and personnel programs that will meet state and federal requirements.
   9. Maintaining a current inventory of materials and procuring all services, spare parts, operational materials, consumables, office equipment, tools and shop equipment, or any other items or materials required to operate or maintain the Equipment. Seller will identify required items, cost, quantity and need date. Buyer shall reimburse the cost of any item or service.
   10. Controlling outages, both planned and unplanned, by using detailed and integrated plans and schedules, and resource management.
   11. Maintaining Equipment performance levels by using routine system and component performance testing.
   12. Establishing open purchase order or contract agreements with vendors, industrial suppliers, jobbers, and maintenance contractors in accordance with this Agreement to ensure timely response to Equipment maintenance needs.
   13. Promptly notifying Buyer in writing of any teardowns and overhauls of major equipment or capital improvements that Seller believes are necessary or advisable together with a proposed schedule for completing such repairs or improvements.

D. Execution or oversight of routine preventive maintenance ("PM") activities in accordance with prudent practices within the industry, including, without limitation:

   1. Lubrication Checks
   2. Cleaning / Flushing

3. Preservation
4. Fluid Changes and Replacement
5. Visual Inspections
6. Operational Monitoring
7. Vibration Analysis
8. Chemical Analysis (water testing)
9. Trend Analysis
10. Calibration
11. Measurements
12. Adjustments
13. Hydrostatic Tests
14. Lube Oil Analysis (sampling only)
15. Replacement of Wear / Sacrificial Parts
17. Resistance Testing

E. Execution or oversight of routine corrective maintenance ("CM") activities in accordance with prudent practices within the industry to troubleshoot, inspect, and repair the Equipment upon identification and detection of certain conditions, including without limitation:

1. Physical fault conditions such as:
   a. Blocked / stopped flow
   b. Fractures / break / breaches
   c. Cracks
   d. Distortion / displacement
   e. Corrosion / discoloration
2. Out of specification conditions such as:
   a. High / low flow, pressure, temperature, or chemistry
   b. Off voltage
   c. Out of limits / adjustments
   d. Erratic output
   e. Intermittent / spurious operation
   f. Failure to control / hold
   g. High / low output
   h. Improper timing
3. Demand fault conditions such as failure to:
   a. Start / run / operate
   b. Stop
   c. Open
   d. Close
   e. Move / release / respond

4. Abnormal characteristics such as:
   a. Overheating
   b. Noise
   c. Vibration
   d. Chatter

e. False response

5. Leakage conditions such as:
   a. Leakage to surrounding environment
   b. Leakage past seats / stems / packing / seals

CM activities not requiring equipment shutdown shall be performed as soon as possible and in order of priority. CM activities requiring Equipment shutdown shall be performed when Equipment is removed from service.

F. Performing such other tasks and services which Buyer may reasonably request from time to time in connection with operation of the Equipment.

.

## EXHIBIT C
## NOTICE OF ELECTION

NOTICE OF ELECTION, dated _____("Notice of Election") to **CONTRACT FOR PURCHASE AND SALE OF EQUIPMENT** dated _____, 201_ ("Agreement"), by and between **PERFECT CIRCLE WATER SYSTEMS, LLC** ("PCWS") and **DISHON DISPOSAL, INC.** (the "Company").

The undersigned authorized officer has executed this document on behalf of PCWS.

1. Perfect Circle Water Systems, LLC, a limited liability company of the State of Delaware, having its offices at 12603 Southwest Freeway Suite 170, Stafford, Texas 77477 ("PCWS") and Dishon Disposal, Inc., a North Dakota corporation, having its offices at 15242 39th Lane NW, Williston, North Dakota 58801 (the "Company"), have previously entered into a Contract for Purchase and Sale of Equipment by and between PCWS and the Company dated as of _____, 201_ ("Agreement").

2. Pursuant to Section 6 of the Agreement, PCWS is authorized to terminate the Agreement at the expiration of the Term of the Agreement or any renewal term.

3. PCWS represents and warrants that the execution and delivery of this Notice and the terminations requested hereby do not violate the terms of any instrument binding on PCWS or the Company with respect to the services being performed by PCWS.

4. PCWS hereby elects and desires to terminate the Agreement as of the date hereinabove.

5. PCWS represents and warrants that PCWS has complied with all relevant section of the Agreement with regard to termination.

IN WITNESS WHEREOF, I have hereunto set my hand as of this ___ day of _____, 201_.

**Perfect Circle Water Systems, LLC**

By: _____
Its: _____

STATE OF _____ )
                       )SS.:
COUNTY OF              )

On this ___ day of _____, 201__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public